IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:13-CV-8-D

| | |
|---|---|
| ROBERT KEELING HARDY, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM AND** |
| ) | **RECOMMENDATION** |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE #25, DE #27] pursuant to Rule 12 of the Federal Rules of Civil Procedure. Plaintiff Robert Keeling Hardy, Jr. ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of his applications for a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") payments. The parties have filed memoranda in support of their respective motions, and the time for filing responsive briefs has expired. Accordingly, the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, the undersigned recommends denying Claimant's Motion for Judgment on the Pleadings, granting Defendant's Motion for Judgment on the Pleadings and upholding the final decision of the Commissioner.

**STATEMENT OF THE CASE**

Claimant protectively filed an application for a period of disability, DIB, and SSI on August 24, 2009, alleging disability beginning June 20, 2008. (R. 20, 71.) His claim was denied initially and upon reconsideration. (R. 98, 100.) A hearing before the Administrative Law Judge

("ALJ") was held on April 12, 2011, at which Claimant was represented by counsel. (R. 42.) Theodore Sawyer, an impartial vocational expert ("VE") appeared and testified. (R. 66–70, 168.) On May 5, 2011, the ALJ issued a decision denying Claimant's request for benefits. (R. 20–35.) On November 8, 2012, the Appeals Council denied Claimant's request for review. (R. 1–3.) Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g) (2012). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance," *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (alterations in original). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the

2

relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

## DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. §§ 404.1520, 416.920 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the Soc. Sec. Admin.*, 174 F.3d 473, 474 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id*. At the fifth step, the burden shifts to the Commissioner to show that other work exists in the national economy which the claimant can perform. *Id*.

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. §§ 404.1520a(b)–(c), 416.920a(b)–(c) (2013). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." 20 C.F.R. §§ 404.1520a(e)(3), 416.920a(e)(3).

3

In this case, Claimant alleges that the ALJ erred by improperly assessing Dr. Phillip Hillsman's medical opinion and improperly assessing Claimant's credibility. (Pl.'s Mem. Supp. Mot. J. Pleadings [DE #26] at 1.)

**FACTUAL HISTORY**

**I.     ALJ's Findings**

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant was no longer engaged in substantial gainful employment. (R. 22.) Next, the ALJ determined Claimant had the following severe impairments: lumbar and cervical degenerative disc disease, Barrett's disease, gout, asthma, left hand fracture, osteoporosis, depression, and anxiety. (*Id*.) The ALJ also found Claimant had non-severe impairments of osteoarthritis of the knees, hemorrhoids, diverticulitis, and hypertension. (R. 23.) However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 23.) Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in mild to moderate limitations in his activities of daily living, social functioning, and concentration, persistence, and pace with no episodes of decompensation. (R. 24.)

Prior to proceeding to step four, the ALJ assessed Claimant's residual functional capacity ("RFC"), finding Claimant had the ability to perform light work subject to the following limitations: (1) avoiding climbing ladders, ropes, and scaffolds; (2) avoiding concentrated exposure to unprotected hazards; (3) avoiding exposure to fumes, dust, and gases; (4) allowing a sit/stand option every thirty minutes; (5) performing simple, routine, repetitive tasks; (6) applying commonsense understanding in carrying out instructions supplied in written, oral, or diagrammatic

form; (7) avoiding more than occasional contact with coworkers and the public; and (8) avoiding high stress situations. (R. 25.) In making this assessment, the ALJ found Claimant's statements about his limitations not credible to the extent they were inconsistent with the RFC. (R. 26.)

At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of his past relevant work as a restaurant manager. (R. 34.) Nonetheless, at step five, upon considering Claimant's age, education, work experience, and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national and state economies. (R. 34–35.)

## II. Claimant's Testimony

At the time of Claimant's administrative hearing, Claimant was 49 years old, had attended some college, and was unemployed. (R. 44, 60.) Claimant was last employed at his family's restaurant, where his duties included cooking, cleaning, hiring, firing, handling payroll, and taking care of odd jobs around the restaurant. (R. 44, 60.)

Claimant explained numerous medical conditions supporting his disability claim and his inability to work full-time. Claimant complained he was suffering from agoraphobia, depression, Barrett's Dysplasia, gout, kidney stones, arthritis, and high blood pressure. (R. 50–55.) Claimant stated that he could not lift more than ten pounds at a time, could only walk for about thirty-five yards before having to stop, and could only stand for about forty-five minutes before having to sit. (R. 56–57.) Claimant's father and sister drive him to his appointments, and Claimant's father drove him to the administrative hearing. (R. 44, 61.) On an average day, Claimant testified that he watches the news, takes care of his two dogs, watches television, sometimes gets on the computer, and mostly spends the day alone. (R. 57.)

5

Claimant reported that he does not like leaving his home, and he can become agitated and experience panic attacks. (R. 45–46.) He stated that he has been experiencing these problems since the first grade. (R. 46.) Claimant's panic attacks can last anywhere from forty-five minutes to several hours. (R. 49.) Claimant stated his anxiety has interfered with his ability to work in his father's restaurant and, at times, he has walked out and left the restaurant when he became too anxious. (R. 47.) Claimant testified that he mostly stays home and avoids contact with other people. (R. 47–48.) Claimant has been prescribed a variety of medications to help alleviate his anxiety, including: Zoloft, Amitryptline, Lexapro, and Chloreptimine. (R. 48.) Claimant stated that he does not do his own shopping, and his only excursion out of the house, besides his appointments, is walking the quarter mile to his mailbox. (R. 49.) Claimant testified that he is depressed ninety percent of the time, and he only sleeps a few hours a night, sometimes having gone six to seven days without sleep. (R. 50.)

Claimant stated he suffers pain in his elbows, hips, knees, wrists, neck, and lower back due to arthritis. (R. 51.) He takes medicine every day and has received hydrocortisone shots to alleviate his pain. (*Id.*) Claimant testified he spends fifteen to sixteen hours a day in bed. (R. 52.) Claimant reported having nine operations on his esophagus because of Barrett's Dysplasia, and stated he must sleep in a recliner in order to remain upright. (R. 52–53.) Claimant regularly has kidney stones and flare-ups of gout that cause him extreme pain. (R. 54–55.) Claimant also takes hydrochlorothiazide and Lysinopril for his high blood pressure. (R. 55.) Claimant stated he had surgery on his left hand because of his arthritis, and he has "trigger finger" on his right hand. (R. 55–56.)

Claimant has been the primary care giver for three women in his life. He cared for his grandmother when she was deteriorating with dementia. (R. 59.) He also stated he cared for his

6

mother after she had gone into hospice care following kidney failure and a massive heart attack. (*Id.*) Claimant testified that the care for his mother mostly consisted of making sure she did not suffer any falls. (*Id.*) Additionally, Claimant took care of a girlfriend that was injured while riding a tractor when it was hit by a car. (*Id.*) His girlfriend had to have a finger removed because of gangrene, but when she was released from the hospital, she was released into Claimant's care. (R. 59–60.)

Claimant testified that he is unable to work due to him having "compulsive obsessive disorder," panic attacks, severe depression, osteoarthritis, osteoporosis, total reconstruction of his left hand, and limited use of his legs, elbows, and hips. (R. 45.)

### III. Vocational Expert's Testimony

Theodore Sawyer testified as a VE at the administrative hearing. (R. 66–70, 168.) After the VE's testimony regarding Claimant's past work experience (R. 66–67), the ALJ posed the following hypothetical question:

> [H]ypothetical number one is limited to 20 pounds, carries 10 pounds frequently; sit, stand and or walk about six hours in an eight hour day. This individual would need a sit stand option of 30 minutes; would have to avoid climbing ladders, ropes and scaffolds; avoid concentrated exposures to hazards, unprotected hazards such as heights and machinery; would have to avoid concentrated exposure to fumes, odors, dusts, and gases.
> This individual as a result of mental conditions, anxiety, pain [sic] would have to be limited to simple, routine, repetitive tasks and they could apply common sense understanding to carry out instructions furnished in written, oral or diagrammatic form. This individual would have to avoid more than occasional contact with co-workers and more than occasional contact with the public. This individual would be able to function appropriately in the normal work place but should avoid high stress situations.
> Based on your description, this individual could not do the past relevant work, could they?

(R. 67–68.) The VE responded in the negative. (R. 57.) The ALJ asked if there was other work available that such a hypothetically limited person could perform. (*Id.*) The VE responded in

7

the affirmative and noted that the following positions would accommodate the requested restrictions: sorter, agricultural produce (DOT 529.687-186), x-ray inspector (DOT 529.685-274), and laundry classifier (DOT 361.687-014). (R. 68–69.) The VE concluded that all jobs existed in significant numbers in both the state and national economies. (*Id.*)

The ALJ then stated a second hypothetical question asking:

> If an individual was limited with the same exertional limitations that I gave you previously in number one but as a result of Anxiety [sic] and other mental impairments, this individual would be unable to deal with the public, would be unable to effectively deal with co-workers, could not take criticism from supervisors and would have difficulty in appearing on a regular basis for work. Is that individual capable of being employed in the economy?

(R. 69.) The VE answered that no positions would be available to such a claimant. (*Id.*)

## DISCUSSION

### I.     Dr. Phillip Hillsman's Medical Opinion

Claimant contends that the ALJ erred by improperly evaluating the medical opinion evidence. (Pl.'s Mem. at 1.) The undersigned disagrees.

Ordinarily, a treating physician's opinion should be accorded greater weight than the opinion of a non-treating physician's opinion, but the court is not required to give the testimony controlling weight in all circumstances. *Mastro*, 270 F.3d at 178. Rather, a treating physician's opinion on the nature and severity of a claimant's impairment is given controlling weight only if it is "supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence on the record." *Id*; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "[B]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Mastro*, 270 F.3d at 178 (quoting *Craig v. Chater*, 76 F.3d

8

585, 590) (4th Cir. 1996)) (internal quotation marks omitted). Thus, the ALJ has the discretion to give less weight to the treating physician's testimony in the face of contrary evidence. *Id.*

If an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must then determine the weight to be given to the treating physician's opinion by applying the following factors: (1) the length of treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidentiary support for the physician's opinion; (4) the consistency of the opinion with the record as a whole; and (5) whether the physician is a specialist in the field in which the opinion is rendered. 20 C.F.R. §§ 404.1527(c)(2)–(5), 416.927(c)(2)–(5); *see also Parker v. Astrue*, 792 F. Supp. 2d 886, 894 (E.D.N.C. 2011).

In the present case, the ALJ gave little weight to Dr. Hillsman's medical opinion concerning Claimant. (R. 33.) After examining the medical records produced by Dr. Hillsman in great detail, the ALJ discredited Dr. Hillsman's opinion because he found it to be inconsistent with the medical evidence of record. (*Id.*) The ALJ explained, "Dr. Hillsman stated the claimant is basically homebound; however, the claimant attended many medical appointments, his friends visited, he had a girlfriend whom he consistently visited while she was hospitalized, and he occasionally worked in his family's restaurant." (*Id.*) The ALJ also noted a discrepancy between Dr. Hillsman's records and Claimant's testimony over whether Claimant had owned and sold an interest in his father's restaurant. (*Id.*) Dr. Hillsman's records show that such an event took place, but Claimant's testimony was that he never owned an interest in the restaurant. (*Id.*) Claimant objects to the ALJ's use of this discrepancy against either himself or Dr. Hillsman, but even without considering this inconsistency in the record, there is substantial evidence supporting the ALJ's application of weight to the opinion evidence.

9

Upon starting treatment with Dr. Hillsman, Claimant was diagnosed with a panic disorder. (R. 304–05.) The ALJ noted that Claimant was "treated on a regular and consistent basis." (R. 29.) Claimant's continued anxiety throughout treatment is recognized in the ALJ's analysis. (R. 29-31.) However, the ALJ also brings attention to notations made in Dr. Hillsman's records that show claimant was responding to anti-anxiety medication and appeared to experience improvement in his symptoms. (R. 30.) The records reflect that, not only was Claimant able to care for his girlfriend when she was sick and routinely visit her in the hospital, but he was also able to successfully attend myriad appointments for his other impairments. This is inconsistent with Dr. Hillsman's assessment that Claimant is essentially homebound and unable to work.

Even given the inconsistency in describing Claimant's capabilities within Dr. Hillsman's own records and with Claimant's testimony, the ALJ still attributed some weight to Dr. Hillsman's medical opinion. This is evident in the fact that the ALJ limited Claimant to light work and additionally limited Claimant to: (1) performing simple, routine, repetitive tasks, (2) applying commonsense understanding in carrying out instructions supplied in written, oral, or diagrammatic form, (3) avoiding more than occasional contact with coworkers and the public, and (4) avoiding high-stress situations. (R. 25.) Thus, the ALJ appropriately weighed Dr. Hillsman's medical opinion in making his RFC determination.

### III. Claimant's Credibility

Claimant contends that the ALJ's credibility determination is not supported by substantial evidence. (Pl.'s Mem. at 1.) The undersigned disagrees.

In assessing a claimant's credibility, the ALJ must follow a two-step process. First, the ALJ must determine whether the claimant's medically determinable impairments could reasonably cause the alleged symptoms. *Craig*, 76 F.3d at 594–95. Next, the ALJ must evaluate the

10

credibility of the claimant's statements regarding those symptoms. *Id.* at 595. The Social Security regulations require that an ALJ's decision "contain specific reasons for the finding on credibility, supported by the evidence in the case record, and . . . be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2 (eff. July 2, 1996).

The ALJ must consider the following factors in addition to objective medical evidence when assessing the credibility of an individual's statements:

(1) Claimant's daily activities;

(2) The location, duration, frequency, and intensity of . . . pain or other symptoms;

(3) Precipitating and aggravating factors;

(4) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate pain or other symptoms;

(5) Treatment, other than medication, received for relief of pain or other symptoms;

(6) Any measures used to relieve pain or other symptoms; and

(7) Other factors concerning functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p, 1996 WL 374186, at *3.

The ALJ first examined whether Claimant's medically determined impairments could reasonably cause Claimant's symptoms and concluded that Claimant's impairments could produce such symptoms. (R. 27–26.) The ALJ then went into great detail about the inconsistencies between Claimant's allegations of inability to work and the information present in the medical record. (R. 32.) Claimant alleged he was unable to work due to his osteoporosis, gout, Barrett's disease, degenerative disc disease, anxiety, and depression. (*Id.*) However, the medical records

11

show that Claimant's gout improved over time and his physician reported that Claimant was "doing fantastic." (R. 581, 609.) The medical records also demonstrate that Claimant experienced functional levels of improvement of the pain in his neck and back from medication and steroid injections. (R. 609.) After receiving several treatments for his Barrett's disease, it was reported that Claimant had a "resolution of [his] regurgitation and no heartburn symptoms." (R. 709.)

Claimant's testimony also shows that he cared for his grandmother due to her dementia until her death, as well as caring for his mother for several years due to her kidney failure and heart problems until her death in June 2008. (R. 58–59.) Additionally, he provided care to his girlfriend after she was injured in an accident until they parted ways in November 2009. (R. 58–59.) During the time Claimant was caring for his girlfriend, he spent less time at the restaurant and around his father, and his depression and anxiety improved. (R. 307.) He began setting boundaries with his father and girlfriend, and the medical records state that he began to feel happier. (R. 307, 319–20.) Further, Claimant reported to his physicians that he was able to cook and clean, walk approximately one mile a day, occasionally work at his father's restaurant, and be sexually active. (R. 305–06, 353, 497, 707.)

The ALJ found that there were inconsistencies within Claimant's testimony, as well as inconsistencies with the information contained within the medical records. (R. 32.) The ALJ also concluded that Claimant's activities were inconsistent with the level of severity and the limitations alleged. (*Id.*) The ALJ stated that while the care Claimant provided the women in his life was commendable, "it is also demonstrative of the ability to maintain employment." (*Id.*) The ALJ additionally explained:

12

> The evidence demonstrates the claimant's anxiety when being around his father and the restaurant, but when he ceased contact with and set boundaries for his father, his mood and affect improved. While receiving treatment, the claimant asserted he did not want to return to the restaurant and was contemplating his next move because he was getting bored. These factors suggest the claimant did not have a complete inability to perform work activities.

(*Id.*)

Due to the inconsistencies among Claimant's statements and between Claimant's statements and the medical record, the ALJ appropriately found that Claimant's statements were not credible to the extent those statements were inconsistent with the RFC. The ALJ properly exercised his discretion in determining Claimant's credibility, and the ALJ's determination of Claimant's RFC is amply supported by the evidence of record.

## CONCLUSION

For the reasons stated above, the undersigned RECOMMENDS that Claimant's Motion for Judgment on the Pleadings [DE #25] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE #27] be GRANTED and the final decision of the Commissioner be AFFIRMED.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who shall have fourteen (14) days from date of service to file written objections. Failure to file timely, written objections shall bar an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Judge.

This 39ý day of January 2014.

KIMBERLY A. SWANK
United States Magistrate Judge